UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TERRY FOSTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:14-cv-0660-RLY-DKL |
| ) | |
| CAROLYN W. COLVIN, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Terry Foster seeks judicial review of the decision of the Acting Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits (DIB). The Honorable Richard L. Young, Chief Judge, designated this Magistrate Judge under Fed. R. Civ. P. 72 and 28 U.S.C. § 636(b)(1) to issue a report and recommendation on Plaintiff's request for review.

**I.    BACKGROUND**

**A. Procedural History**

Foster applied for DIB, alleging that she became disabled on June 1, 2001 because of chronic fatigue syndrome, fibromyalgia, diabetes, autoimmune thyroid disease, high blood pressure, COPD, and breast cancer. Admin. R. (hereinafter "R.") 142. Her date last insured was December 31, 2005. R. at 58–59. Foster's application was denied initially

and on reconsideration. The administrative law judge (ALJ) held a hearing in November 2010 at which Foster, who was represented by counsel, appeared and testified. R. 31–57. A vocational expert also testified at the hearing. *Id.* The ALJ denied Foster's claim in a written decision, and the Appeals Counsel denied review, R. 5–7, making the ALJ's decision the Commissioner's final decision. Foster filed her Complaint in this action seeking judicial review under 42 U.S.C. § 405(g).

### B. Factual Background

Foster was 47 years old when she applied for DIB; she was 49 years old at the time of the ALJ's decision. She has a high school education. She has held jobs inspecting manifolds and computer boards and as a waitress. She last worked on June 1, 2001, her alleged disability onset date. Foster last met the insured status requirements of the Act on December 31, 2005. R. 21.

In November 2000, Russell D. Meldrum, M.D., of IU Orthopaedics and Sports Medicine, saw Foster at a follow-up appointment for a left ankle fracture. R. 396. According to Foster, she had been "virtually unable to bear weight because of pain" for 5 months. *Id.* Dr. Meldrum noted that x-rays revealed the fracture was healed; he also noted that Foster's pain was "out of proportion to her physical examination." *Id.*

Dr. Meldrum referred Foster to Richard W. Jackson, M.D., whom she saw in February 2001. R. 398. Foster reported that physical therapy had made her pain worse. Dr. Jackson prescribed a walking cast for 4 weeks to "break the pain cycle," and advised

her to follow up with an appointment at that time. *Id.* In July 2001, Dr. Jackson noted that Foster had not returned to his office since February because "her appointment kept being changed." R. 395. Foster had worn the cast for 3 months and had been out of it only a few weeks. She still had some swelling, but her foot and ankle were "much better," she could ambulate, and she had a "pretty good" range of motion." Dr. Jackson released Foster to work with "no restrictions" on August 1, 2001. *Id.*

On November 29, 2001, Rafael Grau, M.D., assessed Foster for possible systemic lupus. R. 399–401. Two years before, another physician had found no evidence to support such a diagnosis, but Foster complained of multiple symptoms, including shortness of breath, weakness, muscle spasms, dizziness, headaches, and tachycardia. R. 399. Dr. Grau noted prior diagnoses of fibromyalgia, obesity, hypertension, diabetes mellitus controlled by diet, and irritable bowel syndrome. On examination, Foster's neurologic and musculoskeletal findings were normal, but Foster had multiple soft-tissue tender points. R. 400. Dr. Grau believed that Foster's clinical picture did not suggest lupus. R. 401.

Foster had a mammogram in September 2002, which revealed only benign findings. R. 277.

In March 2005, Foster had an imaging study of her cervical spine following complaints of neck pain from a motor vehicle accident. R. 277, 544. The study indicated mild spondylosis, with minimal degenerative changes at C5-7 manifested by some minimal disc space narrowing and osteophytic spurring, but no fractures. A study of

3

Foster's lumbosacral spine also revealed mild spondylosis, with unremarkable disc spaces, some minimal osteophytic spurring, and no fractures. R. 278, 547.

In April 2005, Foster went to an emergency room with complaints of heaviness in her left chest radiating to her left arm. R. 587. It was noted that she had no prior history of coronary heart disease and was "normally active." *Id.* A stress echocardiogram showed some stress-induced abnormalities, and an EKG revealed sinus bradycardia, but a chest x-ray showed no acute cardiopulmonary process. R. 256–57, 259–60, 268–70, 545–46. The attending physician concluded that the stress echocardiogram was "[n]on-diagnostic" and recommended diagnostic catheterization. R. 588.

In May 2007, an echocardiogram revealed mild pulmonary hypertension. R. 268. In August 2007, Foster had a right heart catheterization from which it was concluded that she had "borderline or high normal pulmonary pressures." R. 391. She was referred for further testing at the Lung Center Clinic at Columbus Regional Hospital. She was evaluated there in September 2007. The physician noted that Foster "has little in the way of any symptoms of exercise limitation" and she "is able to walk as far as she wants." R. 358. She had "little to no lower extremity edema." *Id.* The physician wrote that Foster's "symptoms have been minimal." *Id.* Her cardiovascular examination "was unremarkable" and the physician found "very little evidence to suggest that [Foster] has anything but high normal pulmonary arterial pressures." R. 360. Therefore, he did not believe "that she actually has pulmonary arterial hypertension," but wanted to monitor her as her pressure suggested she could develop it. *Id.*

At a 6-month follow-up examination in March 2008, a physician noted that Foster had "mild pulmonary hypertension," which was managed with prescription medication. R. 225. At another follow-up appointment in November 2008, Foster complained of increased shortness of breath "as of late." R. 227. She had a normal stress echocardiogram, but showed "very mild LVH [left ventricular hypertrophy]." *Id.* The physician assessed her with "mild pulmonary hypertension," medically managed, as well as continued mild shortness of breath. *Id.*

With regard to Foster's breast cancer, a May 2006 mammogram showed "[n]o mammographic evidence of malignancy," R. 254, but a December 2007 mammogram revealed "[s]uspicious right breast microcalcifications in a patient with strong family history of breast cancer." R. 280. Foster had a needle biopsy the same day and was diagnosed with stage zero breast cancer with a "chance of cure approaching 100%." R. 293. She was treated with radiation therapy. A February 2009 mammogram revealed no evidence of any malignancy. R. 343.

Robert Bond, M.D., reviewed the record for the state agency in February 2009, and determined that there was insufficient evidence of disability prior to Foster's date last insured. R. 327. A few months later, another state agency consultant, Fernando Montoya, M.D., reviewed the file and affirmed Dr. Bond's determination. R. 350.

At the hearing before the ALJ, Foster stated that she stopped working in 2000 or 2001 because of muscle and bone pain, breathing issues, headaches, and depression. R. 35–36, 38. She said that at that time, she could hardly walk, did nothing around the house,

and passed the time lying in bed, watching T.V., reading, and seeing doctors. On occasion, however, she would go out to eat. She did no housework, and did not drive, shop, or engage in social activities. R. 38–40. Foster stated that her most serious health problem at the time of the hearing was her pulmonary hypertension. R. 41. She explained that it prevented her from "doing anything physical," she "always" felt out of breath, and it affected her sleeping. R. 41–42. Although her pulmonary hypertension was not diagnosed until 2007, Foster said that it had caused her shortness of breath since 2001 and had progressively worsened. R. 43–45. In addition, Foster stated that her fibromyalgia caused muscle aches and joint pains and was one of the reasons she quit working. R. 47–48. She also testified that she has diabetes that is affecting her kidneys.

The ALJ asked the VE a hypothetical question to assess what jobs Foster could perform. The ALJ told the VE to assume a person who is in her early to mid-40's, who had a high school education, and Foster's work experience, who can perform a full range of light work. R. 52. The VE testified that such a person could return to a past sedentary job of computer board inspector. *See* R. 51–53. The VE further testified that such a person would be able to perform that job with an additional restriction of no "exposure to excessive amounts" of irritants such as gases, smoke, and dust, explaining that the job involved only "mild amounts" of such irritants. R. 54–55. The ALJ asked the VE to assume a sensitivity to mild irritants, and the VE said that the hypothetical individual could perform jobs of reception clerk (1,700 jobs in Indiana and 88,000 nationally) and general office clerk (2,400 jobs in Indiana and 92,000 nationally). R. 55.

The ALJ found that through the date last insured, Foster had the following severe impairments: mild cervical spondylosis, fibromyalgia, and obesity. *Id.* Although Foster was treated for diabetes mellitus, the ALJ found that condition to be a non-severe impairment because it was well-controlled with diet and the residual symptoms had no more than a minimal effect on Foster's ability to work. R. 22. The ALJ determined that Foster did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. Therefore, he assessed her RFC and determined that through the date last insured, Foster had the RFC to perform the full range of light work, *see* 20 C.F.R. § 404.1567(b), R. 22, and was capable of performing her past relevant work as an inspector of computer boards, R. 25. As a result, the ALJ concluded that Foster was not under a disability as defined under the Act at any time from her alleged onset date through the date last insured. *Id.*

## II. DISCUSSION

### A. Legal Standards

The Social Security Act (the "Act") provides for the payment of benefits to persons who have contributed to the program and suffer from a physical or mental disability (DIB). The Act also provides for the payment of benefits to indigent persons under the Supplemental Security Income (SSI) program. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). "Disability" is defined by the Act as the "inability to engage in any substantial gainful activity [because] of any medically determinable physical or mental impairment which

7

can be expected to result in death or which has lasted or can be expected to last … not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A).

A five-step sequential evaluation is used to determine whether a person is disabled under the Act. *See Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); 20 C.F.R. §§ 404.1520(a)(4) (DIB), 416.920(a)(4) (SSI). At step one, the ALJ considers a person's work activity. If the person is engaged in substantial gainful activity, she is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ considers the severity and duration of the person's impairments. If the person does not have a severe impairment, she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ considers whether the person's impairments meet or medically equal the requirements of any impairment listed in the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a person has an impairment that meets or equals a listed impairment, she is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the person does not have such an impairment, then the ALJ assesses the person's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e).

A person's RFC "is the most [the person] can still do despite [her] limitations" and must be based on all the relevant evidence in the record. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At step four, the ALJ uses the RFC to determine if the person can do past relevant work. If she can still do such work, she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). At step five, the ALJ determines whether, given the person's RFC, age, education, and work experience, she can make an adjustment to other work in the

national economy. If she can make an adjustment to other work, she is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). The person seeking benefits has the burden of proof at steps one through four, but the Commissioner has the burden at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Because the Appeals Council denied the request for review, the ALJ's decision became the Commissioner's final decision. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). The Court will uphold the ALJ's decision if it is supported by "substantial evidence," *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014), which "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ need not specifically address every piece of evidence, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008), but "must adequately discuss the issues" and "build an accurate and logical bridge from the evidence to his conclusion." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (internal quotation marks and citation omitted). And as long as the ALJ provides "specific reasons supported by the record," the Court will not overturn a credibility determination "unless it is patently wrong." *Id.* at 651.

**B. Application to this Case**

Foster argues that the ALJ's decision should be reversed. She first claims that the ALJ admitted at the hearing that there was enough documentation to establish disability, but denied her claim because of a lack of a specific diagnosis. Review of the hearing transcript shows that Foster's claim is wrong. The ALJ never admitted that Foster was

9

under a disability. Nor did he deny her claim for want of a specific diagnosis. Instead, the ALJ considered all of Foster's impairments, whether severe or non-severe, in determining whether she could still work.

Foster also argues that she was recently diagnosed with terminal pulmonary hypertension and stage 4 liver disease, both of which began in 1997. But "a mere diagnosis does not establish functional limitations … or an inability to work." *Allen v. Astrue*, No. 10 C 994, 2011 WL 3325841, at *12 (N.D. Ill. Aug. 1, 2011); *see also Gentle v. Barnhart,* 430 F.3d 865, 868 (7th Cir. 2005) ("A person can [be diagnosed with a condition] yet still perform full-time work."). Furthermore, in order to receive disability insurance benefits, Foster had to establish that she was disabled on or before her date last insured. *Allord v. Astrue,* 631 F.3d 411, 416 (7th Cir. 2011). "[I]f she was not disabled by then, she cannot obtain benefits even if she is disabled now." *Martinez v. Astrue,* 630 F.3d 693, 699 (7th Cir. 2011). The record does not establish that Foster was diagnosed with either pulmonary hypertension or liver disease before her date last insured, December 31, 2005. In 2007, her physician did not believe that she had pulmonary hypertension; she was first diagnosed with *mild* pulmonary hypertension in 2008. More to the point, even if she had been diagnosed with pulmonary hypertension or liver disease by her date last insured, the evidence does not establish that either condition had caused any significant functional limitation through her date last insured other than those taken into account in the ALJ's RFC assessment. In 2007, it was noted that she had "little in the way of any symptoms of exercise limitation" and was "able to walk as far as she wants." R. 358. Furthermore, two

state agency consultants, the only physicians to express an opinion on what Foster could do despite her limitations, concluded that she had insufficient evidence of disability prior to her date last insured.

Foster argues that she paid into social security disability and thus should receive benefits. Mere contribution to the social security program does not entitle one to payment of benefits, however. As stated, to receive disability benefits, an applicant must prove that she was under a disability on or before her date last insured. *See, e.g.*, *Allord*, 631 F.3d at 416.

The undersigned has reviewed the record and finds that the ALJ's decision was supported by substantial evidence. The ALJ considered the objective medical and other evidence and provided specific reasons supported in the record for discounting Foster's credibility. For example, he noted that Foster's testimony about her limited daily activities was inconsistent with the medical evidence. Indeed, her claim that when she stopped working, which was on June 1, 2001, she could hardly walk and did nothing was inconsistent with the fact that her treating physician Dr. Jackson released her to work with "no restrictions" *in August 2001*. And the ALJ's decision is supported by the opinions of the two state agency consultants and the VE's testimony.

### III. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**Notice Regarding Objections**

Within fourteen days of being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). The district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection may result in forfeiture of the right to *de novo* determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).

**The parties should not expect extensions of time to file either objections or responses. No replies will be permitted.**

Date: 08/05/2015

*Denise LaRue*

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution:

Terry Foster
5381 Burcham Way
Indianapolis, IN 46224

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov